# United States Court of Appeals for the Federal Circuit

---

**VETERANS4YOU LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2020-1175

---

Appeal from the United States Court of Federal Claims in No. 1:19-cv-00931-LKG, Judge Lydia Kay Griggsby.

---

Decided:  January 11, 2021

---

SARAH C. REIDA, Legal Meets Practical, LLC, Naperville, IL, argued for plaintiff-appellant.  Also represented by JOHN M. MANFREDONIA, Manfredonia Law Offices, LLC, Cresskill, NJ.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE, CORINNE ANNE NIOSI.

THOMAS SAUNDERS, Wilmer Cutler Pickering Hale and

Dorr LLP, Washington, DC, for amicus curiae Kingdomware Technologies, Inc. Also represented by MATTHEW EDWARD VIGEANT.

_____

Before LOURIE, CLEVENGER, and CHEN, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

This is an appeal from the final judgment of the United States Court of Federal Claims ("Court of Federal Claims") on a bid protest action. The Court of Federal Claims ruled in favor of the United States, *Veterans4You, Inc. v. United States*, 145 Fed. Cl. 181 (Fed. Cl. 2019), and Veterans4You, Inc. ("Veterans4You") appeals. For the reasons set forth below, we reverse the final judgment of the Court of Federal Claims.

BACKGROUND

I

Two statutory provisions are central to this appeal. The first is the so-called "Rule of Two," which establishes a contracting preference of the Department of Veterans Affairs ("VA") for Veteran Owned Small Businesses (VOSBs) and Service Disabled Veteran Owned Small Businesses (SDVOSBs). Appellant Veterans4You is a certified SDVOSB. The Veterans Benefits Act of 2006 ("VBA"), codified at 38 U.S.C. § 8127, states in relevant part:

> [A] contracting officer of the Department [of Veterans Affairs] shall award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans or small business concerns owned and controlled by veterans with service-connected disabilities if the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans or small business concerns owned and controlled by veterans with service-connected

> disabilities will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States.

38 U.S.C. § 8127(d). The Supreme Court has held that § 8127(d) requires the VA to comply with the Rule of Two for all contracts awarded by the VA, even if the VA has met its annual goals for awarding contracts to VOSBs and SDVOSBs. *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016).

A separate subsection of § 8127 addresses the situation in which the VA does not itself execute a contract with a non-governmental entity, but instead contracts or otherwise arranges with another governmental agency or entity to acquire goods or services for the VA. Section 8127(i) provides that where "the Secretary [of the VA] enters into a contract, memorandum of understanding, agreement, or other arrangement with any governmental entity to acquire goods or services, the Secretary shall include in such contract, memorandum, agreement, or other arrangement a requirement that the entity will comply, to the maximum extent feasible, with the provisions of this section in acquiring such goods or services." 38 U.S.C. § 8127(i).

## II

The second statutory provision at issue is the "printing mandate," codified at 44 U.S.C. § 501. This section requires that "[a]ll printing, binding, and blank-book work for Congress, the Executive Office, the Judiciary, other than the Supreme Court of the United States, and every executive department, independent office and establishment of the Government, shall be done at the Government Publishing Office ["GPO"][.]" 44 U.S.C. § 501.[1] Agencies are prohibited

---

[1] The office of the Superintendent of the Public Printing, as well as the congressional Joint Committee on Printing, were established in 1852. Act of August 26, 1852,

from obligating or spending appropriated funds on the "procurement of any printing related to the production of Government publications (including printed forms)" unless by or through the GPO. 44 U.S.C. § 501 note.[2]

The substantive requirement of the printing mandate is also reflected in the Federal Acquisition Regulation (FAR). The FAR is promulgated by the FAR Council, comprising members of the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration. *See* 41 U.S.C. § 421. The relevant section of the FAR states that "Government printing must be done by or through the Government Publishing Office (GPO) (44 U.S.C. 501)." *See* FAR 8.802(a) [44 C.F.R. § 8.802(a)].

## III

This appeal arises from the following facts, which are undisputed unless otherwise noted. The VA maintains a suicide prevention Crisis Line. As relevant here, the VA sought to procure cable gun locks with information about the Crisis Line imprinted on the lock body and on a label attached to the cable of the lock, as well as an

---

ch. 91, 10 Stat. 30, 30–35 (1852); *see also* R. W. Kerr, *History of the Government Printing Office (at Washington, D.C.) with a brief Record of the Public Printing for a Century, 1789–1881* at 15–35 (1881). The language of the modern printing mandate originated in an 1895 Act. *See* Act of Jan. 12, 1895, ch. 23, § 87, 28 Stat. 601, 622.

[2]    Legislative Branch Appropriations Act of 1995, Pub. L. No. 103-283, § 207, 108 Stat. 1423, 1440 (1994). The relevant Legislative Branch Appropriations Acts are referred to herein as "§ 501 note," because they are uncodified but have been reprinted as a note to § 501 in Title 44 of the United States Code.

accompanying double-sided wallet card with additional in-formation about the Crisis Line.



J.A. 595–97.

On January 31, 2019, VA submitted a SF-1 requisition form to the GPO to procure the imprinted and labeled cable lock along with the printed wallet card. 145 Fed. Cl. at 185–86; J.A. 100–101. On February 14, 2019, the GPO issued an invitation for bids for the VA's requirements, with un-restricted competition (i.e. not restricted to VOSBs or SDVOSBs). 145 Fed. Cl. at 185–86; J.A. 85, 87–90. On Feb-ruary 21, 2019, Veterans4You filed a bid protest with the Government Accountability Office ("GAO") on the basis

that the solicitation issued by GPO did not give preference to VOSBs or SDVOSBs. 145 Fed. Cl. at 186–87; J.A. 24–44. On June 3, 2019, GAO issued a decision recommending corrective action. 145 Fed. Cl. at 186–87; J.A. 427–33. In particular, GAO concluded that 38 U.S.C. § 8127(i) applied to the solicitation, and that "VA was required to—but did not—alert GPO to its unique requirements, and to have any acquisition performed by GPO on VA's behalf implement, to the maximum extent feasible, [the] requirements of the VBA." J.A. 432. GAO "recommend[ed] that GPO coordinate its efforts with the VA to meet the VA's requirement for suicide prevention gun locks so as to give effect to the requirements of the VBA" and "le[ft] it to the agencies to determine the specific nature of their respective actions necessary to implement our recommendation." J.A. 433.

In light of this determination by GAO, VA submitted a revised SF-1 requisition form to GPO which included the following request: "In accordance with 38 U.S.C. [§] 8127(i), VA requests that GPO, to that maximum extent feasible, set-aside any procurement action resulting from this requisition to verified service-disabled veteran-owned small businesses (SDVOSBs) or verified veteran-owned small businesses (VOSBs). VA maintains a database of all verified SDVOSB and VOSB firms that is publicly available at https://www.vip.vetbiz.va.gov/[.]" J.A. 429–432. In response to this request, the GPO's contracting officer issued a written Determination and Finding which found that, under the GPO's Printing Procurement Regulation ("PPR"), the GPO was obligated to employ unrestricted competitive bidding and had no authority to perform a Rule of Two analysis and formally set aside the procurement for SD/VOSBs. *See* Printing Procurement Regulation, GPO Publication 305.3 (rev. 4-14) at VIII-1.4; J.A. 437–439 (GPO Determination and Finding). Instead, the contracting officer stated that the GPO would "leverage the VA database of all verified SDVOSB and VOSB firms that is publicly available . . . to include verified firms[] on its Bid

List" in order to "accommodate the spirit of VA's request . . . by including known/verified SDVOSBs and VOSBs to its Bid List to ensure they receive an opportunity to bid on this [Invitation for Bids]." J.A. 438.

The GPO subsequently categorized the solicitation under North Atlantic Industry Classification System ("NAICS") Code 323111 (Commercial Printing (except Screens and Books)). The GPO then used VA's VetBiz database to search for SD/VOSBs which were associated with this NAICS code, and which were also registered with GPO. Ultimately, six of the 34 firms on the GPO's bid list were SD/VOSBs registered with VA. J.A. 599–603. The GPO's new solicitation and invitation for bids was issued on June 13, 2019. J.A. 587–98. The goods sought by the solicitation were subsequently procured.[3] Appellant Br. 13.

---

[3] The government did not argue that this case is accordingly moot. We nonetheless have an obligation to "'satisfy [ourselves] . . . of [our] own jurisdiction,' . . . even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)). Here, as in the *Kingdomware Technologies* case (which also concerned a short-term contract issued by the VA), "no live controversy in the ordinary sense remains because no court is now capable of granting the relief petitioner seeks." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1975 (2016). However, the Supreme Court has recognized an exception to the mootness doctrine for a controversy that is "capable of repetition, yet evading review." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998). For essentially the same reasons the Supreme Court articulated in *Kingdomware Technologies*, we find that "[t]hat exception applies to these short-term contracts." 136 S. Ct. at 1976.

IV

On June 26, 2019, prior to the opening of bids on GPO's new solicitation, Veterans4You filed a complaint bringing a pre-award bid protest action, as well as a motion for a preliminary injunction, at the Court of Federal Claims. J.A. 20–23. The parties subsequently filed cross-motions for judgment upon the administrative record. 145 Fed. Cl. at 184. Veterans4You contended that the VA was not obligated to invite the GPO to conduct the solicitation, and that the VA violated 38 U.S.C. § 8127 by doing so. 145 Fed. Cl. at 190–93.

The Court of Federal Claims heard oral argument on August 30, 2019, and issued an oral order from the bench denying Veterans4You's bid protest and motion for injunction. J.A. 684–701. The Court of Federal Claims issued a consistent written decision on September 20, 2019 which denied Veterans4You's cross-motion for judgment upon the administrative record, granted the government's cross-motion for judgment upon the administrative record, denied Veterans4You's motion for a preliminary injunction, and dismissed the complaint. 145 Fed. Cl. at 194. The Court of Federal Claims' written decision reasoned that the goods requested in the solicitation fall within the printing mandate in 44 U.S.C. § 501, that the VA had "adequately explained and documented the reasons for its decision to employ the GPO to conduct the Solicitation," and that the VA had adhered to its obligation under 38 U.S.C. § 8127(i) to secure the GPO's compliance "to the maximum extent feasible" with the Rule of Two. 145 Fed. Cl. at 190–94. This appeal followed.

DISCUSSION

This case is before our Court on appeal from the Court of Federal Claims' grant of judgment upon the administrative record in a bid protest action. We review the grant of judgment on the administrative record "without deference." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351

(Fed. Cir. 2005). Thus, in review of the bid protest, we apply the "arbitrary and capricious" standard in 5 U.S.C. § 706 "anew, conducting the same analysis as the Court of Federal Claims." *Centech v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted). We review the trial court's underlying findings of fact for clear error. *Bannum*, 404 F.3d at 1354. In review of a bid protest, we ask whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In order to satisfy this standard, the protestor must demonstrate: (1) that the procurement decision "lacked a rational basis;" or (2) "a clear and prejudicial violation of applicable statutes or regulations." *Garufi*, 238 F.3d at 1332–33 (citation omitted).

The appellant challenges the constitutionality of the printing mandate (44 U.S.C. § 501) as applied to the facts of this case, and amicus curiae Kingdomware Technologies, Inc. ("Kingdomware") supports the appellant. *See generally* Appellant Br.; Reply Br.; Amicus Br. This issue was neither raised before nor decided by the Court of Federal Claims. *See* 145 Fed. Cl. at 183–94. As discussed in detail below, we nonetheless reach this issue, and we review the constitutional question *de novo*. "The constitutionality of an act of Congress is a question of law that is . . . reviewed *de novo*." *Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314, 1318 (Fed. Cir. 2014) (citing *Brooks v. Dunlop Mfg., Inc.*, 702 F.3d 624, 628 (Fed. Cir. 2012)).

I

Among their arguments about how we should interpret the printing mandate, Veterans4You and amicus Kingdomware have urged that our interpretation of the printing mandate must be guided by the doctrine of constitutional avoidance because "invocation of the printing mandate . . . violates constitutional provisions of separation of powers."

Appellant Br. 22; *see also* Reply Br. 10–13; Amicus Br. 12–18. It is undisputed that no issue of the constitutionality of the printing mandate, including constitutional avoidance as a doctrine of statutory interpretation, was raised before or decided by the Court of Federal Claims. *See* 145 Fed. Cl. at 183–94; J.A. 605–702. The government urges that Veterans4You has waived any argument sounding in the constitutionality of the printing mandate. Appellee Br. 42–43.

"'It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below[.]' [W]hen to deviate from this rule [is] a matter 'left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases[.]'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120–121 (1976)). The Supreme Court has "stopped short of stating a general principle to contain appellate courts' discretion." *Id.* So long as an issue is properly before our Court, the rule of waiver is prudential and does not constrain the scope of our jurisdiction. *See Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1345 (Fed. Cir. 2001). We have explained that "[a] circuit court will disregard the rule [of waiver] in compelling circumstances[,] . . . [p]articularly . . . if the issue has been fully briefed, if the issue is a matter of law or the record is complete, if there will be no prejudice to any party, and if no purpose is served by remand . . . ." *Automated Merch. Sys., Inc. v. Lee*, 782 F.3d 1376, 1380 (Fed. Cir. 2015) (internal citations and quotations omitted).

We find that the constitutionality of the printing mandate, to the extent that it impacts our statutory interpretation of the printing mandate by way of the doctrine of constitutional avoidance, is such an issue. The constitutionality of the printing mandate is a pure question of law which has been fully briefed by the parties before our Court, and we perceive no prejudice to any party in considering this issue now, nor any purpose to be served by remand. Thus, to whatever extent Veterans4You waived any

constitutional challenge to the printing mandate by failing to raise it in the proceedings below, we exercise our discretion to nonetheless consider the issue. We do not reach Veterans4You's argument that the constitutional avoidance issue was not waived because it is merely a new argument in support of an existing claim. Reply Br. 10–11.

## II

The GPO is a congressional entity. Involvement of the Government Printing Office[4] in Executive Branch Printing & Duplicating, 20 Op. O.L.C. 214, 223 (1996) ("The GPO, since its inception, has been conceptualized as a congressional entity."); *see also Thompson v. Sawyer*, 678 F.2d 257, 264 (D.C. Cir. 1982) ("The Government Printing Office is a unit of the legislative branch employing workers in the competitive service."); *United States v. Int'l Bus. Machines Corp.*, 892 F.2d 1006, 1009 (Fed. Cir. 1989) (referencing "legislative agencies like the GPO"). Congress created the Joint Committee on Printing ("JCP") by statute, *see* 44 U.S.C. § 101, and empowered the Committee to "use any measures it considers necessary to remedy neglect, delay, duplication, or waste in the public printing and binding and the distribution of Government publications," *id.* § 103. The JCP comprises ten members of Congress: the chairman and four members of the Committee on Rules and Administration of the Senate, and the chairman and four members of the Committee on House Oversight of the House of Representatives. *Id.* § 101.

---

[4]    The "Government Printing Office" was redesignated the "Government Publishing Office" in 2014. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113–235, div. H, title I, § 1301, 128 Stat. 2130, 2537–39 (2014). It has been referred to as the "GPO" both before and after the redesignation.

Executive branch actors have long maintained the position that the printing mandate in 44 U.S.C. § 501 violates the separation of powers between the legislative and executive branches mandated by the Constitution. The most thorough analysis comes from a 1996 opinion of the Office of Legal Counsel ("OLC"), signed by Walter Dellinger as Assistant Attorney General in charge of the OLC. In this opinion, OLC determined that "the GPO is subject to the sort of control that Congress may not exercise over an actor that performs non-legislative functions." 20 Op. O.L.C. at 224. The opinion thus concluded that "[b]ecause the GPO is subject to congressional control and because the GPO performs executive functions . . . the language in 44 U.S.C. §§ 501 & 501 note requiring the executive branch to procure all of its printing by or through the GPO is unconstitutional." 20 Op. O.L.C. at 226.

Other executive branch actors have reached the same conclusion. Upon signing the Legislative Branch Appropriations Act of 1995, President Clinton issued a signing statement expressing the view that the GPO's role in executive branch printing "raises serious constitutional concerns," and indicating that the President would "interpret the amendments to the public printing provisions in a manner that minimizes the potential constitutional deficiencies in the Act." Statement on Signing the Legislative Branch Appropriations Act of 1995, 30 Weekly Compilation of Presidential Documents 1541, 1542 (July 29, 1994). An earlier OLC opinion during the Reagan Administration, signed by Ted Olson as Assistant Attorney General in charge of the OLC, expressed related concerns about the mechanism by which the JCP exercises control over the GPO (i.e. without bicameralism and presentment): "§ 501 improperly seeks to delegate legislative power to the JCP in abrogation of the constitutional requirements of bicameral passage and presentment." Constitutionality of Proposed Regulations of Joint Committee on Printing, 8 Op. O.L.C. 42, 51 (1984). Finally, the Director of the Office of

Management and Budget in the George W. Bush Administration issued a memorandum[5] to the heads of executive branch departments which cited OLC's 1996 opinion and stated that "Congress ***could not*** constitutionally obligate Executive Branch departments and agencies to utilize GPO." Memorandum from Mitchell E. Daniels, Jr., to Heads of Executive Departments and Agencies (May 3, 2002), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2002/m02-07.pdf (emphasis in original).

Indeed, we do not understand the government to contest Veterans4You's and amicus's position that the statutory printing mandate in 44 U.S.C. § 501, standing alone, is unconstitutional as applied to the executive branch. At oral argument, counsel for the government confirmed that the OLC opinions discussed above reflect the current position of the Department of Justice. Recording of Oral Argument at 23:50–25:20 (Nov. 2, 2020), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20-1175_11022020.mp3.

## III

Rather than directly defending the constitutionality of the printing mandate at 44 U.S.C. § 501, the government

---

[5]    Following the issuance of this memorandum, Public Printer Bruce R. James "proposed to resolve the dispute with OMB by creating a printing 'compact' that would provide agencies with more choice and potentially reduce costs while keeping printing within the requirements of the law. In June 2003, OMB and GPO jointly announced this agreement, and OMB's directive was quietly withdrawn." George D. Barnum & Andrew M. Sherman, Government Publishing Office, *Keeping America Informed: The U.S. Government Publishing Office, A Legacy of Service to the Nation 1861–2016* at 139 (revised ed. 2016).

argues that no constitutional separation of powers concerns are raised here, because VA's actions were controlled by an executive branch regulation rather than by statute. In particular, the government points to Federal Acquisition Regulation ("FAR") 8.802(a) [44 C.F.R. § 8.802(a)], which directs that "Government printing must be done by or through the Government Publishing Office (GPO) (44 U.S.C. 501)." Appellee Br. 43–46. The FAR is promulgated by the FAR Council, comprising members of the Department of Defense, the General Services Administration, and the National Aeronautics and Space administration. *See* 41 U.S.C. § 421. FAR 8.802(a) is thus not a legislative directive.

However, we are not persuaded that the existence of FAR 8.802(a) bears on the question of whether a constitutional separation of powers issue is raised by the invocation of the printing mandate in this case. We agree with Veterans4You that "FAR 8.802(a), which parrots the language of [and cites] 44 U.S.C. § 501," Reply Br. 11–12, does not remedy any constitutional infirmity in 44 U.S.C. § 501 itself. As a general matter, "the existence of a parroting regulation does not change the fact that the question . . . is not the meaning of the regulation but the meaning of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006); *cf.* Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199 (1994). We conclude that the principle of interpretation expressed in *Gonzales* applies equally to questions about a statute's constitutionality where, as here, a regulation parrots a potentially unconstitutional statute. FAR 8.802(a) does not purport to impose a separate and independent printing mandate as a matter of (for example) executive branch internal management, nor does it purport to rely on a source of authority separate from the statutory printing mandate—to the contrary, FAR 8.802(a) merely paraphrases and cites 44 U.S.C. § 501 et seq. Thus, even assuming *arguendo* that the VA's actions at issue here were based entirely on adherence to FAR

8.802(a) (as distinct from adherence to 44 U.S.C. § 501), we conclude that this does not obviate any potential separation of powers concern.

The government further argues that no separation of powers issue is raised because the FAR Council was aware of the 1996 OLC opinion (and a 2002 OLC opinion reaffirming OLC's view), and yet declined to adopt a proposed modification to FAR 8.8 which would have "[r]emov[ed] restrictions in FAR 8.8 that mandated exclusive use of GPO for printing and related supplies." Appellee Br. 44 (citing Federal Acquisition Regulation; Procurement of Printing and Duplicating Through the Government Printing Office, 67 Fed. Reg. 68,914 (Nov. 13, 2002)). However, even presuming that some form of executive-branch acquiescence to the printing mandate is relevant in theory to the separation of powers analysis,[6] OLC's explicit, consistent, and current position on the constitutionality of the printing mandate directly contradicts any argument that such acquiescence has in fact occurred. The FAR Council's failure to amend FAR 8.8 does not affect any separation-of-powers analysis regarding the printing mandate.

---

[6]   *See generally* Shalev Roisman, *Constitutional Acquiescence*, 84 GEO. WASH. L. REV. 668, 668–680 (2016) ("Under the traditional approach to looking at past practice, past practice is deemed to be indicative of constitutional meaning [regarding separation of powers] if one branch has engaged in certain conduct consistently over time and the other has 'acquiesced' in that conduct. If there has been such 'acquiescence,' we are to assume that the practice was constitutional, primarily because practice and acquiescence evince some sort of agreement between the branches on the constitutionality of the practice.").

IV

Given that we do not understand the government to dispute Veterans4You's position that the statutory printing mandate at 44 U.S.C. § 501, standing alone, is unconstitutional as applied to the executive branch, and given our determination that the government's regulatory arguments do not resolve the separation of powers issue that would be implicated by affirming application of the printing mandate in this case, we conclude that the canon of constitutional avoidance counsels us to construe the printing mandate narrowly and avoid its application to the procurement at issue here.

The canon of constitutional avoidance provides that "[w]hen 'a serious doubt' is raised about the constitutionality of an act of Congress," courts should "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The canon "allows courts to avoid the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The Supreme Court has repeatedly cautioned that the canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* at 385.

Here, we find that 44 U.S.C. § 501—in particular, the statutory term "printing"—is susceptible of more than one plausible construction. Veterans4You and Kingdomware do not challenge that the broadest reading of the statutory term "printing" would reach any kind of printed matter, in any format and on any substrate, and as such would embrace the subject matter of the VA's solicitation at issue

here.[7] They however argue that a narrower reading of the term, limited to a particular category of printed matter, is both appropriate and supported by the historic context in which the term has been used in the statute. Thus, the statutory term is susceptible of more than one construction, and the interpretative canon of constitutional avoidance is invoked.

---

[7] The term "printing" is not defined in 44 U.S.C. § 501, or elsewhere in 44 U.S.C. Chapter 5. Section 501 note states that "as used in this section, the term 'printing' includes the processes of composition, platemaking, presswork, duplicating, silk screen processes, binding, microform, and the end items of such processes." There is some ambiguity regarding whether this definition of "printing" is properly applied to the term as used in § 501. The language in § 501 note arose from the Legislative Branch Appropriations Act of 1995, which did not purport to amend § 501—it amended Section 207 of the Legislative Branch Appropriations Act of 1993. *See* Pub. L. 103-283, 108 Stat. 1423, 1440 ("Section 207(a) of the Legislative Appropriations Act, 1993 (Public Law 102-392) is amended . . ."). Thus, the phrase "this section" as used in § 501 note refers to Section 207 of the 1993 Act, not § 501. The Court of Federal Claims concluded without discussion that the definition of "printing" in § 501 note applied to the term "printing" as used in § 501. 145 Fed. Cl. at 190–91. Before our Court, amicus Kingdomware articulated the above basis for its argument that the definition in § 501 note does not apply to § 501. Amicus Br. 7–9. The government did not respond to this argument, and instead asserted without discussion that "Congress further defined printing to include [the definition in § 501 note]." Appellee Br. 29–30. We need not resolve this issue conclusively because it does not alter our conclusion that the printing mandate does not apply to the solicitation at issue here.

We agree that the canon of constitutional avoidance allows a narrow interpretation, and we hold that the printing mandate in 44 U.S.C. § 501 applies only to the production of written or graphic published materials. Based on the undisputed factual record, we thus conclude that the solicitation at issue here does not involve "printing" within the meaning of 44 U.S.C. § 501, because the goods which are the object of the solicitation (including the components that involve some element of "printing" in a broad sense, such as the wallet card and the imprinted information on the body of the padlocks) are not written or graphic published materials.[8]

V

Several lines of reasoning support and underlie our determination that this is a reasonable construction of the printing mandate. First, this scope of the term "printing" is consistent with the broader context of the term's usage in the statute, as well as with dictionary definitions of "printing." In determining the meaning of, and potential ambiguity in, a statute, we look to "the [statutory] language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The language of the first statutory printing mandate, enacted in 1895, referred

---

[8]    We also reject the government's apparent position that the application of 44 U.S.C. § 501 to this solicitation is a finding of fact, which we are to review for clear error. Appellee Br. 30 ("[T]he trial court did not clearly err in finding that the printing and imprinting here is 'printing' for the purposes of the GPO's printing statute."). The trial court made factual findings about the nature and characteristics of the goods sought by this solicitation, *see e.g.* 145 Fed. Cl. at 185–86, 190–91, which we do not understand the parties to dispute. However, the meaning of the term "printing" in § 501 is a question of law, which we review *de novo*.

to "[a]ll printing, binding, and blank books." Act of Jan. 12, 1895, ch. 23, § 87, 28 Stat. 601, 622. The current printing mandate similarly refers to "printing, binding, and blank-book work." 44 U.S.C. § 501. As the contemporary dictionaries cited by amicus Kingdomware demonstrate, the terms "binding" and "blank-book work" refer to the production of written and graphic published materials. *Webster's Common School Dictionary* 31 (1892) (defining "binding" as referring to "anything that binds; . . . the cover of a book"); *American Dictionary of Printing and Bookmaking* 47–48 (1894) (describing "blank-books" as bound volumes of blank pages or forms, such as account ledgers and address books). Our construction of the term "printing" is thus supported by "the canon *noscitur a sociis*, according to which 'a word is known by the company it keeps.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (citations omitted). In other words, we understand "printing" to encompass the production of written and graphic published materials, just as the terms "binding" and "blank-book work" do.

We are further persuaded by Kingdomware's argument that the context of the statutory language supports our construction of the term "printing." *See* Amicus Br. 4–11. The Legislative Branch Appropriations Act of 1993 (the Act which was modified by the Legislative Appropriations Act of 1995, which 1995 Act included the definition of "printing" in § 501 note) refers specifically to "printing related to the production of Government publications (including printed forms)." 106 Stat. at 1719. "Government publications" is (and was at the time of the 1993 Act) defined in 44 U.S.C. § 1901 to mean "informational matter which is published as an individual document at Government expense, or as required by law." *See* Act of Oct. 22, 1968, Pub. L. 90-620, 82 Stat. 1238, 1283. These references to "Government publications" and "printed forms," both of which encompass published written and graphic materials in the traditional sense, support our view that "printing" within the meaning

of § 501 is limited to written or graphic published materials.

Our construction of the term "printing" is also supported by modern dictionary definitions. "Printing" means "the transfer of characters or designs on to paper, etc., by a mechanical process; the production of books, newspapers, magazines, etc., by this means." *Oxford English Dictionary Online* (Sept. 2020); *see also Collins English Dictionary* 1579 (12th ed. 2014) (defining "printing" as "the process, business, or art of producing printed matter[;] . . . printed text[;] . . . all the copies of a book or other publication printed at one time[;] . . . a form of writing in which letters resemble printed letter[.]"). In view of our determination that the canon of constitutional avoidance compels a narrow interpretation of the printing mandate, we need not conclude that our construction is the only possible construction. These dictionary definitions support our view that our construction of the statutory term "printing" is reasonable.

Second, this scope of the printing mandate comports with the historical functions and activities of the GPO, which evidence a nearly universal focus on the production of written or graphic published materials. The statutory history demonstrates this focus as a textual matter. The earliest qualifications for the Superintendent of Public Printing were that "said Superintendent shall be a practical printer, versed in the various branches of the arts of printing and book-binding." Act of August 26, 1852, ch. 91, 10 Stat. 30, 30 (1852). The 1895 Act, where the language of the statutory printing mandate originated, also evidences this focus. That Act refers in several places to "printing, binding, lithographing, or engraving," and includes, for example, extensive provisions governing the Public Printer's acquisition of paper for use by the GPO. 28 Stat. at 601–06.

Documentary history of the GPO's activities since 1895 also demonstrates this focus as a practical matter. For example, a collected photographic history of the GPO from 1861 to 1961 catalogs the evolution of the GPO's facilities and equipment, and documents the GPO's performance of the tasks incident to the production of written or graphic published materials, such as typesetting, proofing, binding, and engraving. *See* Government Printing Office, *100 GPO Years, 1861–1961: A History of United States Public Printing* 78–79 (2010 ed.) (spanning 40 unnumbered pages of photographs). These photographs also document specialized equipment and methods for the production of particular government documents for which the GPO has historically maintained responsibility, such as patents, federal income tax forms, the Congressional Record, and the Federal Register. *Id.* This focus has remained during unusual historical circumstances as well—for example, during WWI, the GPO produced "millions of copies of drillbooks, handbooks, regulations, etc." for the Army, "75 million thrift cards, 25 million questionnaires and blanks, 27 million notices of classifications, and numerous orders ranging from one to five million each" for the Navy, and "many millions of posters, pamphlets, and circulars" for the Department of Agriculture. George D. Barnum & Andrew M. Sherman, Government Publishing Office, *Keeping America Informed: The U.S. Government Publishing Office, A Legacy of Service to the Nation 1861–2016* at 54 (revised ed. 2016) (internal quotations omitted). In summary, we conclude that our construction of the term "printing" within the meaning of 44 U.S.C. § 501 comports with the GPO's historical focus on the production of written or graphic published materials.

## VI

Finally, we turn to § 8127 of the VBA (38 U.S.C. § 8127), the statutory provision containing the so-called Rule of Two. As discussed, the Court of Federal claims held that the goods sought under the solicitation at issue here

fall within the printing mandate at 44 U.S.C. § 501, 145 Fed. Cl. at 190–91, a holding we presently reverse. Following from this holding, the Court of Federal Claims concluded that since the GPO (not the VA) was properly conducting the solicitation, 38 U.S.C. § 8127(i) (not § 8127(d)) controlled. 145 Fed. Cl. at 191–94. The Court of Federal Claims further concluded that VA had complied with its obligations under § 8127(i) "to request that the GPO employ a Rule of Two analysis 'to the maximum extent feasible,'" though it is undisputed that GPO's own regulations prevent GPO from adhering to a formal veteran preference or set-aside of the nature that § 8127(d) requires VA to perform where VA is conducting a procurement itself. *Id.*

In light of the administrative record, we understand VA's decision to route this solicitation through the GPO to have been premised on an understanding on the part of VA, confirmed by GPO, that VA was obligated by the printing mandate[9] to route this solicitation through GPO. *See, e.g.,* J.A. 50–53, 58–59, 437–39. Because we reverse the Court of Federal Claims' determination that the goods sought under the solicitation fall within the printing mandate, we do not reach the question of whether VA was in compliance with its obligations under § 8127(i). We also do not reach the issue of whether VA could permissibly route solicitations like this one through GPO as a matter of discretion, rather than as a matter of legal obligation under the printing mandate, and what (if any) constraints on such a

---

[9]    Including both the statutory printing mandate at 44 U.S.C. § 501 and FAR 8.802. The record is at times ambiguous regarding whether VA understood itself to be following FAR 8.802, or 44 U.S.C. § 501 directly. As explained, we do not find any distinction between these sources of authority to be meaningful with respect to either the scope of the printing mandate or the separation of powers analysis.

decision would be imposed by the various provisions of the VBA.

### CONCLUSION

We have considered the parties' remaining arguments, and find them unpersuasive. For the reasons above, we reverse the Court of Federal Claims' determination that the printing mandate applied to the solicitation at issue here, and thereby obligated VA to route the solicitation through GPO. We remand to the Court of Federal Claims for further proceedings consistent with this opinion. The final judgment of the Court of Federal Claims is

**REVERSED AND REMANDED**

### COSTS

No costs.